**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CATHY TEEL, | ) | CASE NO. 1:13-CV-00755 |
| | ) | |
| Plaintiff, | ) | JUDGE PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Cathy Teel ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be REMANDED for proceedings consistent with

this Report and Recommendation.

## I.  PROCEDURAL HISTORY

On May 13, 2010, Plaintiff filed an application for SSI, alleging a disability onset

date of September 25, 2003.[1]  (Transcript ("Tr") 10.)  The application was denied initially

and upon reconsideration, and Plaintiff requested a hearing before an administrative law

---

[1]      Plaintiff later amended her alleged disability onset date to May 13, 2010,
the date she filed her application for SSI.  (Tr. 26.)

judge ("ALJ").  (*Ia.*)  On October 5, 2012, an ALJ held a video hearing.  (*Id.*)  Plaintiff

appeared, was represented by an attorney, and testified.  (*Ia.*)  A vocational expert

("VE") also testified.  (*Ia.*)  On November 6, 2012, the ALJ found that Plaintiff was not

disabled.  (Tr. 7.)  On February 22, 2013, the Appeals Council declined to review the

ALJ's decision, and that decision became the Commissioner's final decision.  (Tr. 1.)

On April 5, 2013, Plaintiff filed her complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. Nos.

16, 17.)

Plaintiff asserts the following assignments of error: (1) the ALJ committed

reversible error by failing to explain his rationale for finding that Plaintiff's impairments

did not meet or equal a Listing at Step Three of the sequential evaluation; and (2) the

ALJ improperly applied the treating physician rule with respect to the opinion of treating

psychiatrist Byong Jik Ahn, M.D.

## II.  EVIDENCE

**A.  Personal and Vocational Evidence**

Plaintiff was born in August 1961 and was 48-years-old on the alleged disability

onset date.  (Tr. 15.)  She had a limited education and was able to communicate in

English.  (*Id.*)  She had past relevant work as a cashier, a laundry sorter, and a

greenhouse laborer.  (*Id.*)

**B.  Medical Evidence**

**1.  Physical Impairments**

**a.  Medical Reports**

2

On January 31, 2005, Plaintiff saw Dr. Donna Sexton-Cicero due to complaints of arthralgia in her hands, wrists, and hips, and achiness in her neck.  (Tr. 579.)  Dr. Sexton-Cicero noted x-rays of the lumbar spine from November 2003 had shown moderate-to-severe degenerative disc disease at L4-L5, and that bilateral hand and wrist x-rays from December 2003 showed no evidence of erosions.  (*Id.*)  Dr. Sexton-Cicero's impressions included fibromyalgia and osteoarthritis.  (*Id.*)

On August 8, 2007, Mazen Elyan, M.D., a physician specializing in rheumatoid arthritis, examined Plaintiff.  (Tr. 289.)  Plaintiff reported a history of diffuse aches and pains that had become progressively worse and had not improved with trigger point injections or medications.  (*Id.*)  A physical examination showed that Plaintiff had reduced range of motion and moderate tenderness in the neck.  (Tr. 290.)  Her muscle strength was normal, but she displayed tender points in certain sites including suboccipital muscle insertion bilaterally, bilateral low cervical anteriorly, and the upper border of the trapezius bilaterally.  (*Id.*)  Dr. Elyan reported that a cervical MRI from March 2007 showed severe C3-C4 and C5-C6 canal stenosis with flattening of the spinal cord and moderate C6-C7 stenosis.  (*Id.*)  Dr. Elyan listed Plaintiff's diagnoses as myalgias and myositis, not otherwise specified; depressive disorder, not elsewhere classified; cervical spondylosis; hepatitis C, without hepatic coma not otherwise specified; and nicotine abuse.  (*Id.*)  Dr. Elyan noted that Plaintiff's condition was consistent with fibromyalgia but that lab work would be done to rule out other possibilities.  (*Id.*)

On September 24, 2007, Plaintiff saw Dr. Elyan for a follow-up appointment.  (Tr. 286.)  Plaintiff reported pain in the neck, shoulders, lower back, thighs, and legs.  (*Id.*)

3

Plaintiff had multiple tender points.  (*Id.*)  The range-of-motion in her neck was moderately reduced with paraspinal tenderness, and the range-of-motion in her lumbar spine was also moderately reduced with pain.  (*Id.*) Dr. Elyan diagnosed fibromyalgia and noted that it was severe.  (Tr. 288.)  She encouraged Plaintiff to get involved in aerobic exercise on a daily basis.  (*Id.*)  Dr. Elyan also diagnosed cervical spondylosis and lumbosacral spondylosis.  (*Id.*)  She noted that Plaintiff had not had a good response to non-steroidal and anti-inflammatory drugs, ultram, or injections and concluded that opioid treatment was appropriate.  (*Id.*)

Imaging of the lumbar spine in October 2007 revealed fairly prominent disc space narrowing at L4-L5 with a vacuum disc phenomenon at this level as well as irregularity of the adjacent bony end plates and some spurring at this level.  (Tr. 284.)  There was moderate spurring at L4-L5 and calcification in the abdominal aorta and iliac vessels. (Tr. 285.)  Dr. Elyan again assessed Plaintiff's fibromyalgia as severe and agreed to contact the insurance company to seek approval of Lyrica.  (*Id.*)  On March 24, 2008, Plaintiff reported to Dr. Elyan that Vicodin was providing only fair control, but she continued to have occasional flares.  (Tr. 280.)

On July 21, 2008, Plaintiff saw David Ryan, M.D.  (Tr. 273.)  Her chief complaint was pain all over but mostly in her lower back.  (Tr. 274.)  A pain assessment showed that Plaintiff was positive for depression.  (*Id.*)  Her duration for standing was 30 minutes, sitting was 15 minutes, and walking was 30 minutes.  (*Id.*)  Lumbar flexion was mildly painful, and extension was severely painful.  (Tr. 275.)  She had tenderness to palpation in the lumbar area, but no reflex deficits.  (*Id.*)  Her motor strength was normal in all myotomal regions in the bilateral upper and lower extremities and her gait was

4

normal.  (*Id.*)  Dr. Ryan's primary diagnosis was lumbosacral spondylosis, for which he prescribed median nerve branch blocks and an increased dosage of Lyrica.  (Tr. 276.)

On January 21, 2009, Plaintiff saw Dr. Krishna Hari Perall for a refill of her medications.  (Tr. 294.)  Plaintiff reported pain in the neck, shoulders, lower back, thighs, and legs.  (*Id.*)  She said she had fair pain control with Lyrica and Vicodin but still had occasional flares.  (*Id.*)  Plaintiff's diagnoses included hyperlipidemia, fibromyalgia, lumbosacral spondylosis without myelopathy, depressive disorder (not elsewhere classified), and insomnia (unspecified).  (Tr. 295.)

An MRI of Plaintiff's cervical spine from March 2, 2009, revealed varying degrees of canal and neuroforaminal stenosis due to underlying congenital stenosis, disc herniation, and disc osteophyte complexes and facet arthropathy, primarily involving C3-4 through C6-C7.  (Tr. 633.)  An MRI of the lumbar spine revealed varying degrees of bilateral neuroforaminal stenosis, with greatest involvement at L4-5 and L5-S1, and broad-based disc herniation at L4-L5 resulting in no significant canal stenosis.  (Tr. 634.)

On April 6, 2009, Plaintiff saw Abdallah Kabbara, M.D., with complaints of neck and low back pain.  (Tr. 598.)  Dr. Kabbara advised Plaintiff that he did not feel that continuation with opioid therapy was needed, and he rearranged her medications which included increasing her dosage of Lyrica.  (Tr. 600.)  On April 15, 2009, Plaintiff underwent a medial nerve branch block at L3, L4, and L5, bilaterally.  (Tr. 596.)  She tolerated the procedure well and was advised to follow-up with the Pain Management Center to reassess her improvement and determine the need for radiofrequency ablation.  (*Id.*)  On April 23, 2009, Plaintiff reported to Dr. Kabbara that the facet

5

injections only worked for one day and that her pain had returned.  (Tr. 594.)  Dr. Kabbara reported that Plaintiff had tenderness upon the palpation of the lumbar facet area, but there was no neurological deficit apparent on her physical examination.  (*Id.*)

Plaintiff went to the emergency room on April 29, 2009, with complaints of acute low back pain, for which she received a Toradol injection.  (Tr. 335.)  She returned to the emergency room on August 17, 2009, with complaints of chronic back pain.  (Tr. 324.)  She returned again on March 16, 2010, with complaints of chronic back pain.  (Tr. 314.)  She had bent down to put on a dog leash and felt something pull in her back.  (*Id.*)  X-rays of the lumbar spine revealed severe disc space narrowing at L4-5 with endplate sclerosis and osteophytes. (Tr. 341.)  The doctor's impression was degenerative disc disease L4-5.  (*Id.*)

On August 10, 2009, Plaintiff saw Mohamed Shahed, M.D., an internist, to establish primary care.  (Tr. 369.)  Plaintiff complained of neck and low back pain and rated her pain as ten out of ten in severity.  (*Id.*)  Dr. Shahed prescribed Naproxen, Zanaflex, and Vicodin and referred Plaintiff for pain management services.  (Tr. 371.)

On October 19, 2009, Fares Raslan, M.D., examined Plaintiff.  (Tr. 638.)  A musculoskeletal examination revealed severe tenderness in the paravertebral muscles of the lumbar spine with limited range of motion with flexion, extension, lateral bending, and rotation.  (*Id.*)  Plaintiff's gait was antalgic.  (*Id.*)  Dr. Raslan reviewed Plaintiff's March 2009 MRIs and concluded that she had severe spondylosis in the lumbar spine with no radiculopathy, without myelopathy at that point, secondary to facet hypertrophy causing severe lower back pain with radiation along the L5 territories, with no disc herniation.  (*Id.*)  Plaintiff also had neurogenic claudication resulting from her back

6

impairment.  (Tr. 638.)  Dr. Raslan reported that Plaintiff was a valid candidate for

radiofrequency ablation of the medial branch of the facet joints of the lumbar spine

bilaterally.  (Tr. 639.)

On April 23, 2010, Isam Diab, M.D., performed a rheumatological evaluation for

complaints of generalized aches and pain.  (Tr. 299.)  Dr. Diab reported that the clinical

picture was consistent with inflammatory polyarthritis, rheumatoid varient, mildly active.

(*Id.*)  He reported that other connective tissue disease was still possible, including

systemic lupus erythematosus or mixed connective tissue disease.  (*Id.*)  Dr. Diab also

noted that fibromyalgia was a contributing factor to a lot of Plaintiff's symptoms,

especially generalized fatigue and interrupted sleep.  (*Id.*)

On September 16, 2011, Plaintiff saw Vanston Masri, M.D., with complaints of

constant, sharp back pain that was radicular to the lower extremities up to the knee.

(Tr. 502.)  A pain assessment revealed that Plaintiff was positive for depression,

weakness, temperature/color changes and allodynia/hyperalgesia.  (*Id.*)  On

examination of the cervical spine, flexion was moderately painful and extension was

severely painful.  (Tr. 503.)  She had tenderness to palpation from C2-7, but most

prominent at C5-7.  (*Id.*)  Lumbar examination revealed that flexion was not painful,

extension was moderately painful, and rotation was not painful.  (*Id.*)  Plaintiff's

neurologic exam was normal.  (*Id.*)

On September 17, 2011, Plaintiff saw Dr. Ryan for axial low back pain and

cervical pain with significant fibromyalgia overlay.  (Tr. 504.)  Dr. Ryan noted that he

discussed with Plaintiff the unrealistic nature of the expectation to be pain free.  (*Id.*)  X-

rays of the lumbar spine from December 2011 revealed severe degenerative disc

7

changes at the L4-L5 level, with spurring, disc space narrowing, and vacuum disc phenomenon.  (Tr. 517.)

On February 20, 2012, Plaintiff saw Krista L. Mousted, M.D., for pain management.  (Tr. 557.)  Plaintiff described her pain as sharp and continuous and made worse by sitting and lying down.  (*Id.*)  Dr. Mousted diagnosed fibromyalgia, cervical spondylosis, depressive disorder (not elsewhere classified), insomnia, and lumbosacral spondylosis.  (*Id.*)

### b.    Agency Reports

On June 17, 2011, state agency medical consultant William Bolz, M.D., opined that Plaintiff retained the ability to perform light duty work, with lifting/carrying limited to up to 20 pounds occasionally and 10 pounds frequently; standing/walking limited to about six hours total in and eight-hour workday; sitting limited to about six hours total in an eight-hour workday; no more than occasional climbing of ladders, ropes, or scaffolds; no more than frequent climbing of ramps/stairs, stooping, kneeling, or crawling; and no more than frequent handling and fingering bilaterally.  (Tr. 474-480.)

On July 5, 2010, state agency medical consultant Nick Albert, M.D., concluded that Plaintiff retained the ability to perform medium level work, and that he could lift and carry up to 50 pounds occasionally and 25 pounds frequently; he could stand and/or walk for about six hours total during an eight-hour workday; and he could sit for about six hours total during an eight-hour workday.  (Tr. 379-386.)

### 2.    Mental Impairments

### a.    Medical Reports

8

On May 3, 2012, Plaintiff underwent a psychiatric evaluation by Byong J. Ahn, M.D.  (Tr. 576.)  Plaintiff reported problems with depression and a need to sleep all the time.  (*Id.*)  On mental status examination, Plaintiff denied having any dangerous ideas, suicidal or homicidal thoughts, or hallucinations.  (*Id.*)  Her insight was limited and her judgment was fair.  (Tr. 576-577.)  Her cognitive function did not appear to be impaired and her affect was "a little bit restricted and then depressed."  (Tr. 577.)  Dr. Ahn's diagnosis included major depression recurrent type and rule out bipolar affective disorder.  (*Id.*)  He prescribed Zonegran, Inderal, and Paxil.  (*Id.*)

Plaintiff saw Dr. Ahn again on May 31, 2012.  (Tr. 575.)  Plaintiff was upset and crying because her mother had recently had a stroke.  (*Id.*)  Plaintiff reported that she felt that her medications were not working.  (*Id.*)

On July 10, 2012, Plaintiff returned to Dr. Ahn and reported that her depression was better.  (Tr. 654.)  She admitted that her mood and depression were better and that she did not have any suicidal thoughts.  (*Id.*)  Dr. Ahn prescribed Xanax instead of Klonopin, as Plaintiff complained that the Klonopin did not work.  (*Id.*)

On September 4, 2012, Plaintiff told Dr. Ahn that she was "not doing that well." (Tr. 653.)  Plaintiff reported financial difficulties related to her mother's recent placement in a nursing home.  (*Id.*)  She also reported having a lot of anxiety.  (*Id.*)  Dr. Ahn noted that Plaintiff was complaining a lot and demanding that he increase her Xanax dose. (*Id.*)

On September 6, 2012, Dr. Ahn completed an Assessment of Ability to do Work-

9

Related Activities (Mental).  (Tr. 649.)  Dr. Ahn opined that Plaintiff had a marked[2]

degree of limitation in the following areas: ability to maintain concentration and attention

for extended periods; ability to perform activities within a schedule, maintain regular

attendance, and be punctual; ability to respond to customary work pressures; and ability

to perform complex, repetitive, or varied tasks.  (Tr. 649-650.)  Dr. Ahn noted that the

severity of Plaintiff's limitations existed since at least May 13, 2010, and that her

condition is likely to deteriorate if she is placed under stress, especially that of a job.

(Tr. 650.)  He anticipated that Plaintiff's impairments or treatment would cause her to be

absent from work about twice per month.  (*Id.*)

### b.    Agency Reports

On September 9, 2010, Plaintiff underwent a consultative psychological

evaluation by Thomas M. Evans, Ph.D.  (Tr. 387.)  Dr. Evans observed that Plaintiff's

ambulation was within normal limits and she walked without assistance, but that she

appeared to be in a moderate degree of physical distress throughout the entire

evaluation.  (Tr. 389.)  Plaintiff reported that she began experiencing symptoms of

depression in 2004.  (*Id.*)  She rated her depression as an eight on a scale of one to ten,

with ten being the worst.  (*Id.*)  She reported that her symptoms include depressed

mood, fatigue, lack of motivation, and frequent irritability.  (*Id.*)  Plaintiff noted that her

daily activities included helping her mother clean, cook, do laundry, and go grocery

shopping.  (Tr. 390.)  She stated that on a typical day, she does light housework and

---

[2]     The form defined "marked" as a serious limitation that severely limits the
        ability to function (*i.e.,* on task 48% - 82% in an eight-hour workday).  (Tr.
        649.)

10

watches TV and only leaves her house when she has to. (*Id.*) Dr. Evans' assessment included dysthymic disorder and a Global Assessment of Functioning ("GAF") score of 60.[3] (Tr. 391.)

On September 22, 2010, state agency psychiatric consultant John Waddell, Ph.D., concluded that Plaintiff's affective disorder was not "severe" within the meaning of the Act. (Tr. 393.) Dr. Waddell opined that Plaintiff had mild limitations in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace. (Tr. 403.)

On June 8, 2011, consultative examiner Wilfredo M. Paras, M.D., opined that Plaintiff's ability to perform work-related physical and mental activities was mainly limited by chronic low back pain as well as muscle pain, such that her general work limitation at that time was "light" work. (Tr. 467.) Dr. Paras also noted that one of Plaintiff's "major problems" was depression with episodes of mood swings and that she would need psychiatric follow-up and a psychiatric evaluation to determine a final general work limitation. (*Id.*)

On June 17, 2011, state agency psychiatric consultant Cynthia Waggoner, Psy.D., concluded that Plaintiff's affective disorder was not "severe." (Tr. 351.) She opined that Plaintiff was only mildly limited in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or

---

[3]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

11

pace.  (Tr. 361.)

**C.     Hearing Testimony**

      **1.         Plaintiff's Testimony**

Plaintiff testified that in October 2012, she was 5'6" and weighed 230 pounds. (Tr. 31.)  She noted that her medications have caused her to gain a tremendous amount of weight.  (*Id.*)  Plaintiff completed the tenth grade but has a twelfth grade reading level. (Tr. 32.)  She stopped working full-time near the end of December 2003.  (*Id.*)  She had worked at a greenhouse and as a cashier at a grocery store.  (*Id.*)

When asked by her counsel about her quality of life during her first video hearing in 2008, Plaintiff testified that she was in pain then too, but that her back pain is "way worse today."  (Tr. 36.)  She stated that her back pain is "all up and down" and into her lower spine.  (*Id.*)  She is always in pain from her fibromyalgia, and her average pain level is an eight out of ten.  (Tr. 37.)  Housework – such as leaning forward to wash dishes or running the vacuum cleaner – exacerbates her pain.  (*Id.*)  Plaintiff does not experience any numbness or tingling, but pain often radiates down her leg.  (*Id.*)  She has had to go to the emergency room on more than one occasion due to the pain.  (*Id.*)

Plaintiff can walk up about ten steps.  (Tr. 38.)  She can stand in one spot for about twenty to thirty minutes.  (*Id.*)  She did not believe she could stand for six hours out of an eight-hour day.  (*Id.*)  She is sometimes able to walk down her long driveway to get the mail, which takes about three minutes.  (Tr. 39.)  Other days she "just can't do it."  (*Id.*)  Plaintiff testified that she could lift about 10 pounds.  (Tr. 40.)  Plaintiff takes about ten different prescriptions and cannot drink alcohol with the medications.  (Tr. 41.)

Plaintiff testified that she was being treated for depression and mood swings by

12

Dr. Ahn and had seen him two times.  (Tr. 42.)  Plaintiff has been depressed since she got sick in 2004.  (Tr. 43.)  She stated that Dr. Ahn said she has mood swings, but that she does not think that is true because he only talked to her for an hour.  (Tr. 44.)

Plaintiff stated that her energy level is best in the morning, but that in the afternoon she becomes less energetic because her medicine begins to wear off.  (Tr. 43.)  Plaintiff sleeps well due to her sleeping pills, and her appetite is "not too bad."  (*Id.*)

## 2.  VE Testimony

A licensed clinical counselor and vocational counselor, Gene Burkhammer, also testified at Plaintiff's hearing.  (Tr. 46.)  The ALJ asked the VE to consider a hypothetical individual limited to light work with no climbing of ladders, ropes, or scaffolds, and occasional limitations with regard to other postural activities.  (*Id.*)  The individual must have no exposure to unprotected heights or dangerous equipment or products, extreme cold, or vibration of hand tools.  (*Id.*)  The individual is moderately limited in responding appropriately to work pressures, where moderate means that there is more than a slight limitation in the area but the individual is still able to function satisfactorily.  (Tr. 47.)  The individual is in the age range of 48 to 51, has a tenth grade education, and has no past relevant work.  (*Id.*)  The ALJ opined that the hypothetical individual would be capable of performing the following jobs: housekeeping cleaner (light level) (approximately 2,000 jobs regionally; 30,000 in Ohio; and 500,000 nationally); and mail clerk (light level) (approximately 600 jobs locally; 7,000 in Ohio; and 160,000 nationally).  (*Id.*)

The ALJ presented a second hypothetical to the VE that was the same as the first

13

hypothetical but added that the individual had marked[4] limitations in maintaining attention and concentrating for extended periods; marked limitations in understanding or being able to carry out detailed or complex instructions; marked limitations in working at a production-rate pace, maintaining attendance, and being punctual; marked limitations in responding appropriately to instructions; and having the need to take unusual breaks. (Tr. 47-48.)  The individual also has moderate[5] limitations in working with supervisors, coworkers, and the public as well as sustaining an ordinary routine without special supervision, adapting to change in routine work settings, and behaving in an emotionally stable manner.  (Tr. 48.)  The individual also has mild[6] limitations in deterioration of personal habit; ability to stay on task for standard periods; and understanding, remembering, and carrying out simple instructions as well as making judgments on simple decisions.  (*Id.*)  Additionally, the individual would miss two days of work per month.  (*Id.*)  The VE opined that an individual of the same age, education, and experience as Plaintiff and with the aforementioned limitations could not perform any work.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

---

[4]    The ALJ defined "marked" as meaning that there is a serious limitation in the area with substantial loss in the ability to function effectively.  (Tr. 48.)

[5]    The ALJ did not define the term "moderate."  (*Id.*)

[6]    The ALJ defined "mild" as meaning that there is a serious limitation in the area but that the individual could perform the function to satisfaction.  (*Id.*)

14

*of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national

15

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff has not engaged in substantial gainful activity since May 13, 2010, the application date.

2.   Plaintiff has the following severe impairments: degenerative disc disease, fibromyalgia, and obesity.

3.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.   After careful consideration of the entire record, the undersigned finds that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except Plaintiff should never be required to climb a ladder, rope, or scaffold and should only occasionally be required to climb a ramp or stairs; or to balance, crouch, stoop, kneel, and crawl, meaning no more than two hours and forty minutes of an eight-hour workday.  She can frequently gross handle items and use her fine finger and feel sensation, meaning no more than five hours and twenty minutes of an eight-hour workday.  She should never be exposed to unprotected heights, dangerous equipment or products, and cold environments or vibration.  She is moderately limited in her ability to respond appropriately to work pressures, meaning she has more than a slight limitations in this area, but she is still able to function satisfactorily.  "Moderately limited" is functionally equivalent to "frequently" as it applies to exertional limitations.

5.   Plaintiff is unable to perform any of her past relevant work.

6.   Plaintiff was born in August 1961 and was 48-years-old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.   Plaintiff has a limited education and is able to communicate in English.

. . . . .

9.   Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that Plaintiff can perform.

10.  Plaintiff has not been under a disability, as defined in the Act, since May 13, 2010, the date the application was filed.

(Tr. 12-16.)

## LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports

17

the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.    Plaintiff's Assignments of Error**

**1.    The ALJ Committed Reversible Error by Failing to Explain His Rationale for Finding that Plaintiff's Impairments Did Not Meet or Equal a Listing at Step Three of the Sequential Evaluation.**

Plaintiff argues that the ALJ erred by failing to provide any rationale for his finding that Plaintiff's impairments do not meet or equal a Listing.  Plaintiff further argues that the ALJ's inadequate Step Three finding was not harmless error, because the evidence of record indicates that Plaintiff's back condition met or medically equaled Listing 1.04(C). The Commissioner responds that substantial evidence supports the ALJ's finding that Plaintiff did not meet or equal a listed impairment.  For the following reasons, Plaintiff's argument is well taken.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).  Nevertheless, it is the claimant's burden to show that he meets or medically equals[7] an impairment in the

_____

[7]    A claimant may be found disabled if her impairment is the *medical equivalent* of a listing.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Listings.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)

(per curiam).

Listing 1.04 sets forth disorders of the spine.  *See* 20 C.F.R. Pt. 404, Subpt.

404, App. 1, 1.04.  Plaintiff contends that she satisfies the requirements of section (C) of

Listing 1.04, which states:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
> . . .
>
> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.[8]

---

This means that the impairment is "at least equal in severity and duration to the criteria of any listed impairment."  20 CFR § 416.926(a); 20 CFR § 404.1526(a).  An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any listed impairment.  *Cf. Lawson v. Comm'r of Soc. Sec.*, 192 Fed.Appx. 521, 529 (6th Cir. 2006) (upholding ALJ who "compar[ed] the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the SSA regulations").

[8]  20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.00(B)(2)(b), provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.04(C).

Here, the ALJ concluded at Step Two of his analysis that Plaintiff's degenerative disc disease, fibromyalgia, and obesity were severe impairments.  (Tr. 12.)  He then concluded at Step Three that he "considered the listings and has determined the claimant does not meet or medically equal the applicable criteria for any listed impairments."  (*Id.*)  The ALJ did not note which Listings he considered or engage in any further discussion at Step Three.  Plaintiff argues that the ALJ's failure to provide any rationale for his conclusion that Plaintiff does not meet or medically equal the criteria for a Listing renders his step three findings to be without support in substantial evidence.

Plaintiff relies on the Sixth Circuit's decision in *Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411 (6th Cir. 2011)*, to support her argument.  In that case, the ALJ determined, at step two of the sequential analysis, that the claimant had the severe

definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

impairments of back pain and adjustment disorder.  At step three of the analysis, the ALJ made a general conclusion that the claimant's impairments did not satisfy the criteria for any listing in Section 1.00, which addresses musculoskeletal conditions, or in Section 12.00, which addresses mental impairments.  Thereafter, although the ALJ continued to discuss the criteria for Listing 12.04 in detail, the ALJ did not address any specific listing in Section 1.00.

The Sixth Circuit determined that the ALJ had erred in failing to analyze whether the claimant's back impairment satisfied the criteria for any of the Listings in Section 1.00. *Id.* at 416 ("Ultimately, the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments.  Put simply, he skipped an entire step of the necessary analysis.").  According to the Sixth Circuit, the ALJ's failure to do so deprived the court of the ability to conduct a meaningful review of his decision:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.*

In *Reynolds,* the ALJ generally concluded, in the first paragraph of his analysis, that Plaintiff's impairments did not satisfy the criteria of Listing 1.00 or Listing 12.00, and then proceeded to analyze the criteria of only Listing 12.04, without any further discussion of Listing 1.00.  Here, the ALJ did not go as far as even mentioning Listing 1.04, even after concluding in his Step Two analysis that Plaintiff had the severe impairment of degenerative disc disease.  Thus, the ALJ's failure to mention – let alone discuss – Listing 1.04 altogether is even more problematic than the conclusory third-step

analysis that the court rejected in *Reynolds.*  Application of *Reynolds* to this case results

in the conclusion that the ALJ erred in failing to address whether Plaintiff's degenerative

disc disease satisfied the criteria of Listing 1.04, which governs disorders of the spine.

*See Shea v. Astrue*, No. 1:11-CV-1076, 2012 WL 967088 (N.D. Ohio Feb. 13, 2012)

(Burke, M.J.) ("Without more than a conclusory statement regarding [the plaintiff's]

physical impairments, the Court is deprived of the opportunity to provide meaningful

judicial review and cannot determine whether the ALJ's conclusion is supported by

substantial evidence.")

        The Commissioner argues that *Reynolds* is distinguishable from Plaintiff's case,

because in *Reynolds*, the court remanded not merely as a formalistic matter of

procedure, but because the court determined that it was possible that the evidence the

claimant put forth could meet Listing 1.04.  *Reynolds*, 424 Fed. App'x. at 416.  According

to the Commissioner, remand is not necessary here despite the ALJ's failure to compare

the evidence of record to the requirements of any listings, because "there is no

possibility that the evidence [Plaintiff] has put forth meets or equals Listing 1.04C."

(Defendant's Response ("Def.'s Resp.") at 20.)  The Commissioner's Response includes

citations to medical evidence in the record that the Commissioner argues does not

support a finding that Plaintiff's impairment meets or equals the criteria of Listing

1.04(C).[9]  (Def.'s Resp. 17-20.)  Nonetheless, although the Commissioner's Response

discusses record evidence that the ALJ may have relied upon to determine that

_____

    [9]     Plaintiff's Brief sets forth evidence from the record to support her
        argument that Plaintiff meets "at least one Listing; *i.e.,* Listing 1.04C."
        (Plaintiff's Brief ("Pl.'s Br.") at 20-22.)

22

Plaintiff's degenerative disc disease did not meet the relevant listing, "the courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted)). Absent some analysis from the ALJ regarding the medical observations and their relation to the criteria of Listing 1.04(C), this Court cannot meaningfully determine whether substantial evidence supports the ALJ's conclusion that Plaintiff's degenerative disc disease did not satisfy that Listing. *See, e.g., Davis v. Comm'r of Soc. Sec.*, 5:12 CV 2577, 2013 WL 3884188 (N.D. Ohio July 26, 2013) (Gwin, J.) (remanding where the ALJ provided no discussion of medical records regarding the plaintiff's MS and their relation to Listing 11.09(A)); *Grohoske v. Comm'r of Soc. Sec.*, 3:11 CV 410, 2012 WL 2931400, *3, n.53 (N.D. Ohio July 18, 2012) (Baughman, M.J.) (remanding, noting that "the ALJ's discussions at step four were not so extensive as to provide sufficient evidence of [the plaintiff's] impairments in light of the listing as to permit a court to conclude from other parts of the ALJ's opinion that the listings were not met.") For the foregoing reasons, Plaintiff's first assignment of error presents an adequate basis for remand.

### 2. The ALJ Improperly Applied the Treating Physician Rule with Respect to the Opinion of Byong Jik Ahn, M.D.

Plaintiff takes issue with the ALJ's treatment of Dr. Ahn's September 6, 2012, assessment of Plaintiff's mental ability to do work-related activities. (Tr. 649-650.) According to Plaintiff, Dr. Ahn was her treating psychiatrist, and therefore his opinion

was entitled to controlling weight.  The Commissioner responds that the ALJ did not

consider Dr. Ahn to be one of Plaintiff's treating physicians, and therefore he did not err

by giving only minimal weight to his opinion.  The Commissioner further argues that

even if Dr. Ahn was a treating source, substantial evidence supports the ALJ's decision

to assign minimal weight to his opinion.

A treating source is defined as "your own physician, psychologist, or other

acceptable medical source who provides you, or has provided you, with medical

treatment or evaluation and who has, or has had, an ongoing treatment relationship with

you." 20 C.F.R. § 404.1502.  Generally, an ongoing treatment relationship exists when

the patient sees or has seen the treating source with a frequency consistent with

accepted medical practice for the type of evaluation required for the medical condition at

issue.  *Id.*  "An ALJ must give the opinion of a treating source controlling weight if he

finds the opinion 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques' and 'not inconsistent with the other substantial evidence in the

case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)

(quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating

source's opinion may be given little weight if it is unsupported by sufficient clinical

findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d

342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less

than controlling weight, he must give "good reasons" for doing so that are sufficiently

specific to make clear to any subsequent reviewers the weight given to the treating

physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544

(quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

"Classifying a medical source requires us to interpret the definitions in [20 C.F.R.] § 404.1502, a question of law we review *de novo*."  *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007).  This Court must accord substantial deference to any factual finding by the ALJ bearing on the question.  *Id.*  Here, it is not entirely clear whether the ALJ considered Dr. Ahn to be a treating source, as the ALJ did not make a definitive finding on the record.  Given the context of the ALJ's assessment of Dr. Ahn's opinion, there is some support for the argument that the ALJ did not consider Dr. Ahn to be a treating source when evaluating his opinion.  After concluding that Plaintiff did not have any significant mental health history to support Dr. Ahn's findings of marked limitations and noting that Dr. Ahn's opinion was at odds with the opinion of Dr. Paras, the ALJ noted: "Furthermore, the claimant testified she had only visited Dr. Ahn twice at the time of the hearing."  (Tr. 14.)  Thus, a reasonable conclusion based on the context of the ALJ's decision and Plaintiff's testimony[10] is that the ALJ did not consider Dr. Ahn to be a treating source.

On the other hand, an argument can be made that the ALJ *did* consider Dr. Ahn to be a treating source and was therefore required to give his opinion controlling weight absent good reasons for not doing so.  At the beginning of Plaintiff's hearing, the ALJ referred to Dr. Ahn as "the treating doctor."  (Tr. 27.)  Furthermore, despite the fact that Plaintiff testified to seeing Dr. Ahn only two times, the record indicates that Dr. Ahn

---

[10]     Plaintiff seemed to imply during her hearing that Dr. Ahn did not know her well enough to adequately assess her impairments.  She testified that although Dr. Ahn said that she had mood swings, she did not agree with him.  (Tr. 44.)  She then explained that Dr. Ahn "only talked to me for an hour."  (*Id.*)

performed an evaluation of Plaintiff on May 3, 2012 (Tr. 576-577), saw Plaintiff for

follow-up care on May 31, 2012 (Tr. 575), July 10, 2012 (Tr. 654), and September 4,

2012 (Tr. 653), and prescribed Plaintiff medications.  Because it is unclear whether the

ALJ considered Dr. Ahn to be a treating source, this Court cannot properly determine

whether the ALJ erred by giving less than controlling weight to Dr. Ahn's opinion.

Because Plaintiff's first assignment of error has presented a basis for remanding her

case to the ALJ, the ALJ is hereby directed to explain on remand whether he considers

Dr. Ahn to be one of Plaintiff's treating sources, the reasons therefor, and the weight

accorded to Dr. Ahn's opinion.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be REMANDED for proceedings consistent with this

Report and Recommendation.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: November 20, 2013


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of this notice.  **28 U.S.C. § 636(b)(1)**. Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981)**; *Thomas v. Arn*, **474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986)**.

26